UTAH CONSOL. MINING CO. v. UTAH APEX MINING CO.*

(Circuit Court of Appeals, Eighth Circuit. December 4, 1922.)

No. 6075.

1. Mines and minerals ⬅38(14)—Ore presumed to belong to claim under which it lies.

Ore is presumed to belong to the owner of the claim under whose surface it lies.

2. Mines and minerals ⬅31(3)—Continuity of lode does not depend on continuity of mineral.

Continuity of a lode, within Rev. St. § 2322 (Comp. St. § 4618), giving extralateral rights in lodes apexing on a claim, does not depend on the mineral deposits therein being in contact throughout or uninterrupted.

3. Mines and minerals ⬅31(1)—Unless it has been mineralized, rock between defined walls is not lode or vein, within statute giving extralateral rights.

Rock, whether brecciated or bedded, is not a mineral vein, lode, or ledge, within Rev. St. § 2322 (Comp. St. § 4618), giving extralateral rights on a mineral vein, lode, or ledge, even when it is found between well-defined walls, unless it has been mineralized.

4. Mines and minerals ⬅38(15)—Evidence held to show limestone between porphyry dyke and mineralized fissure was nonmineral.

Evidence of explorations by a defendant *held* to sustain a finding that a bed of limestone between quartzite was not mineral bearing between the point where it was intersected by a porphyry dyke, above which it was mineralized, and the point under plaintiff's claim, about a quarter of a mile distant, where there was a fissure containing the ores in controversy.

5. Mines and minerals ⬅16—"Mineral bearing vein or lode" defined.

Though the term "mineral bearing vein or lode" is not susceptible of arbitrary definition applicable to every case, its controlling characteristic is a continuous body of mineral bearing rock in place, having boundaries, though they may not have been ascertained, separating it from the general mass of the surrounding formation.

6. Courts ⬅107—Opinion must be read with reference to facts stated therein.

Every opinion by a court must be read in connection with all that is said in it, and the controlling principles of law which it announces are applied to the facts found within its four corners.

7. Judgment ⬅708—Opinion not conclusive as to facts in another action, to which litigant was not party.

An opinion by the Supreme Court in an action involving the same formation as in the case at bar, that on the facts stated in the former case there was a continuous mineral bearing lode or vein, is not conclusive as to the facts in the case at bar, and the record in the previous case is not to be considered to determine what facts were there found, under the principle that a party litigant is not bound by facts adduced in a prior controversy over a different subject-matter to which he was not a party.

8. Mines and minerals ⬅31(3)—Continuity of lode apexing on defendant's claim held broken before reaching ore under plaintiff's claim.

Where the ore in controversy was taken by defendant from a fissure under plaintiff's claim in a bed of limestone which outcropped on defend-

ant's claim, where it was mineralized, but it appeared that between a porphyry dyke, which intersected the limestone bed about 900 feet underground and above which the bed was mineralized, and the fissure from which the ore in controversy was taken, there was a bed of nonmineralized limestone substantially undisturbed, the continuity of the lode or vein apexing on defendant's claim was broken before it reached the ore in controversy, so that defendant was not entitled to that ore.

Appeal from the District Court of the United States for the District of Utah; Tillman D. Johnson, Judge.

Suit in equity by the Utah Apex Mining Company against the Utah Consolidated Mining Company to quiet title and for an accounting and injunction against further extraction of ores under its claims. Decree for complainant, and defendant appeals. Affirmed.

See, also, 277 Fed. 41.

John P. Gray, of Cœur d'Alene, Idaho, and A. C. Ellis, Jr., of Salt Lake City, Utah (George Sutherland, of Washington, D. C., on the brief), for appellant.

John A. Marshall, of Salt Lake City, Utah, and William E. Colby, of San Francisco, Cal. (Marshall, Macmillan & Crow, of Salt Lake City, Utah, on the brief), for appellee.

Before LEWIS and KENYON, Circuit Judges, and MUNGER, District Judge.

LEWIS, Circuit Judge. Appellant mined and carried away lead and copper ore of great value from within the boundaries of mining claims belonging to appellee; whereupon the latter brought this suit to quiet its title, for an accounting and for injunction against further extraction and obtained decree and judgment accordingly, from which this appeal. The ore was found about 1,500 feet vertically under the surface of appellee's claims. The deposit was in and along or associated with an east and west fissure, known as the Leadville fissure, and was fairly continuous in an east and west course for more than 2,000 feet, with variable height and thickness. Most of it was in a limestone bed which had been cut through and faulted by the fissure, though a small part was out in quartzite which lay under and over the limestone. The fissure in the quartzite underlying the limestone, through the limestone and in the quartzite above was the probable channel through which the mineralizing solutions reached the limestone bed. Ore deposits replaced the lime, extending through the bed from quartzite to quartzite, and at places into the quartzite.

[1] Presumptively, the ore belonged to appellee, and its prima facie case was made out on a showing or admission that the ore body was under its ground. St. Louis M. & M. Co. v. Montana M. Co., 194 U. S. 235, 24 Sup. Ct. 654, 48 L. Ed. 953; Boston & Montana M. Co. v. Montana Co., 188 U. S. 632, 638, 23 Sup. Ct. 434, 47 L. Ed. 626; Keely v. Ophir Hill Con. M. Co., 169 Fed. 601, 95 C. C. A. 99; Stewart M. Co. v. Bourne, 218 Fed. 327, 134 C. C. A. 123; Wakeman v. Norton, 24 Colo. 192, 49 Pac. 283. But appellant, for its defense, asserted title to the ore and its right to mine and take it in virtue of the provisions of section 2322, R. S. U. S. (5 U. S. Comp. Stats. § 4618), reading in part thus:

"The locators of all mining locations heretofore made or which shall hereafter be made, on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, * * * shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side-lines of such surface locations. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges;"

the claim of appellant being that the limestone bed in which the ore was found is a lode within the meaning of the statute as that term is defined in the Eureka Case, 4 Sawy. 302, Fed. Cas. No. 4,548, and the Lawson Case, 134 Fed. 769, 67 C. C. A. 587, Id., 207 U. S. 1, 28 Sup. Ct. 15, 52 L. Ed. 65, that its top or apex lies within mining claims belonging to appellant, and that the ore along the fault is included in that lode. The strike of the limestone bed is east and west, viewed from its outcrop on appellant's ground. It has a downward course to the north at an angle of about 30 degrees from the horizon. It is from 100 to 400 feet thick, usually about 250 feet, and lies between quartzite.

Appellee does not deny but admits that the limestone bed outcrops,— has its apex on appellant's mining claims, that on its dip it extends into appellee's ground, and that the larger part of the ore in controversy was found in the bed along the Leadville fault. It is further conceded that the limestone bed is a lode as defined in the cases supra, down to what is known as the ninth or 900-foot level of appellant's mine, and to still further depths to the east; but appellee insists that no part of the segment of the bed dipping under its ground is a lode below the ninth level. The ore mined by appellant on and above the ninth level shows that the ore bodies in the upper part of the limestone bed raked or pitched downward to the east. They have been followed down to lower depths and found to trend farther and farther to the east in the bed with depth. The shortest distance with the dip of the limestone from where ore was found and mined out above down to where the ore was found under appellee's claims is more than a quarter of a mile. This roughly rectangular block of limestone, with dimensions of more than a quarter mile each way, lying just above the ore found along the fault and extending upward to ore deposits which have been taken out above, is not shown to be mineralized, and the exploitation to which it has been subjected and the development work that has been done in it point to the conclusion that it is barren ground. The District Judge so found. The facts also brought him to the conclusion, which we think cannot be seriously disputed, that a porphyry sheet or dyke, from few to many feet in thickness, dipping at a greater angle than the limestone bed, cut through the bed at about the ninth level and extended into the quartzite above and below. As it passed through the bed, sheets of porphyry split off from the dyke and extended out into the limestone as tongues or fingers. Just to the east a great

mass of this igneous rock intruded and displaced both sedimentaries. From this mass of porphyry on the east the limestone bed is known to extend westerly uninterrupted for about three-quarters of a mile; and east of the intruding porphyry it appears again. The Lawson Case, supra, brought under consideration a mine in this same limestone about 3,000 feet east of appellant's mine. There it was called the Jordan lode, here the Highland Boy.

[2, 3] From what has been said it is obvious that the continuity of appellant's lode downward from the ninth level is the contested point. Continuity of a lode does not depend on the mineral deposits being in contact throughout or uninterrupted. They are usually found here and there apart from each other and variable in volume and richness. But as a rule ore deposits in a vein or lode are interrelated mineralogically, showing a general like condition throughout the one mass of rock, where it is mineralized and where it is not, as to its recipiency to mineralizing processes, though the extent of their operation may be greater at one place than at another. Fissures or seams through which the mineralizing solutions have passed, sometimes so narrow and tight that it is difficult to discover and follow them, frequently lead from one deposit to another not far away. That, we understand, is the prevailing condition in bedded formation of the large proportions we have here, when transformed into mineral lodes. The statute deals with "any mineral vein, load, or ledge"; and rock, whether brecciated or bedded, is not a vein or lode within the statute, even when found between well-defined walls, unless it has been mineralized. Appellant's claim to the ore under appellee's ground is not based on the fact alone that it is found in the limestone bed. That is admitted, as to the greater part of the ore. The point in dispute is whether the limestone bed, conceded to be a lode from its apex down to appellant's ninth level, continues on down as a mineral lode for more than a quarter mile to the ore under appellee's ground,—was its continuity terminated at the ninth level by the porphyry dyke or this barren limestone below it.

Turning now to the Eureka Case we find in the opinion delivered by Mr. Justice Field, from which there was no dissent by Sawyer, Circuit Judge, and Hillyer, District Judge, who sat with him (Fed. Cas. No. 4,548), first, a definition of a lode in these terms:

"Those acts [1866 and 1872] give no definition of the term. They use it always in connection with the term 'vein.' The act of 1866 provided for the acquisition of a patent by any person or association of persons claiming 'a vein or lode of quartz, or other rock in place, bearing gold, silver, cinnabar or copper.' The act of 1872 speaks of veins or lodes of quartz or other rock in place, bearing similar metals or ores. Any definition of the term should, therefore, be sufficiently broad to embrace deposits of the several metals or ores here mentioned. In the construction of statutes, general terms must receive that interpretation which will include all the instances enumerated as comprehended by them. The definition of a 'lode' given by geologists is, that of a fissure in the earth's crust filled with mineral matter, or more accurately, as aggregations of mineral matter containing ores in fissures. See Von Cotta's Treatise on Ore Deposits, Prime's Translation, 26. But miners used the term before geologists attempted to give it a definition. * * * Those acts were not drawn by geologists or for geologists; they were not framed in the interests of science, and consequently with scientific accuracy in the use of terms. They were framed for the protection of miners in the claims which they had

located and developed, and should receive such a construction as will carry out this purpose. \* \* \* It is difficult to give any definition of the term as understood and used in the acts of Congress, which will not be subject to criticism. A fissure in the earth's crust, an opening in its rocks and strata made by some force of nature, in which the mineral is deposited, would seem to be essential to the definition of a lode, in the judgment of geologists. But to the practical miner, the fissure and its walls are only of importance as indicating the boundaries within which he may look for and reasonably expect to find the ore he seeks. A continuous body of mineralized rock lying within any other well-defined boundaries on the earth's surface and under it, would equally constitute, in his eyes, a lode. We are of opinion, therefore, that the term as used in the acts of Congress is applicable to any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock. It includes, to use the language cited by counsel, all deposits of mineral matter found through a mineralized zone or belt coming from the same source, impressed with the same forms, and appearing to have been created by the same processes;"

and then a statement of facts which brought the stratum of limestone within the definition, thus:

"It is bounded on the south side for its whole length, at least so far as explorations have been made, by a wall of quartzite of several hundred feet in thickness; and on its north side, for a like extent, by a belt of clay, or shale, ranging in thickness from less than an inch to seventy or eighty feet. \* \* \* The limestone found between these two limits—the wall of quartzite and the seam of clay or shale—has, at some period of the world's history, been subjected to some dynamic force of nature, by which it has been broken up, crushed, disintegrated, and fissured in all directions, so as to destroy, except in places of a few feet each, so far as explorations show, all traces of stratification; thus specially fitting it, according to the testimony of the men of science, to whom we have listened, for the reception of the mineral which, in ages past, came up from the depths below in solution, and was deposited in it. Evidence that the whole mass of limestone has been, at some period, lifted up and moved along the quartzite, is found in the marks of attrition engraved on the rock. This broken, crushed and fissured condition pervades, to a greater or less extent, the whole body, showing that the same forces which operated upon a part, operated upon the whole, and at the same time. Wherever the quartzite is exposed, the marks of attrition appear. Below the quartzite no one has penetrated. Above the shale the rock has not been thus broken and crushed. Stratification exists there. If in some isolated places there is found evidence of disturbance, that disturbance has not been sufficient to affect the stratification. The broken, crushed and fissured condition of the limestone gives it a specific, individual character, by which it can be identified and separated from all other limestone in the vicinity. \* \* \* This broken, crushed and fissured condition of the limestone, the presence of the oxides of iron, the caves or chambers we have mentioned, with the wall of quartzite and seam of clay bounding it, give to the zone, in the eyes of the practical miner, an individuality, a oneness as complete as that which the most perfect lode in a geological sense ever possessed. Each of the characteristics named, though produced at a different period from the others, was undoubtedly caused by the same forces operating at the same time upon the whole body of the limestone. Throughout this zone of limestone, as we have already stated, mineral is found in the numerous fissures of the rock. According to the opinions of all the scientific men who have been examined, this mineral was brought up in solution from the depths of the earth below, and would therefore naturally be very irregularly deposited in the fissures of the crushed matter, as these fissures are in every variety of form and size, and would also find its way in minute particles in the loose material of the rock. The evidence shows that it is sufficiently diffused to justify giving to the limestone the general designation of mineralized matter—metal-bearing rock."

The decree was affirmed in Richmond M. Co. v. Eureka M. Co., 103 U. S. 839, 26 L. Ed. 557, on another ground. In the Lawson Case, which dealt with this same limestone bed at a point easterly some 3,000 feet, it is described thus:

"A careful examination and consideration of the evidence clearly convinces us that the stratum of limestone constitutes a single broad vein or lode of mineral bearing rock extending from the quartzite on one side to the quartzite on the other. The limestone has been profoundly broken, altered, and mineralized, and has thereby obtained an individuality which, apart from other differences, clearly distinguishts it from the neighboring rock. There is a local absence of ore in places, a continuous occurrence of it in others, and a seeming local occurrence of it in still others, but the ore bodies are not separated, one from another, by any defined boundaries. As in Eureka Consolidated Mining Co. v. Richmond Mining Co., 8 Fed. Cas. 819, 825 (No. 4,548), they are parts of one greater deposit, which permeates, in a greater or less degree, with occasional intervening spaces of barren rock, the whole mass of limestone. As shown by extensive exploration and actual mining, the mineralization has been so general that its only defined limits are the quartzite walls which bound the limestone, and within it one may reasonably expect to encounter ore by driving or cross-cutting in any direction;"

and it was further pointed out that small fissures in the limestone extended in every direction, that much of the limestone had been mechanically and chemically altered until the entire original stratification or bed structure had disappeared, and it was held that whatever may have been the mineralizing process, the alteration and mineralization of the limestone were so general and extensive as to convert it into a single broad vein or lode. Other definitions of veins or lodes, under dissimilar conditions, are given in Iron Silver M. Co. v. Cheesman, 116 U. S. 529, 6 Sup. Ct. 481, 29 L. Ed. 712; Bunker Hill & Sullivan M. Co. v. Empire State-Idaho M. Co. (C. C.) 134 Fed. 268; Book v. Justice M. Co. (C. C.) 58 Fed. 107; Waterloo M. Co. v. Doe, 82 Fed. 45, 27 C. C. A. 50; Beals v. Cone, 27 Colo. 473, 62 Pac. 948, 83 Am. St. Rep. 92.

[4] Appellee concedes that the Highland Boy limestone down to appellant's ninth level is broken, crushed, fissured, altered and mineralized to such an extent as to constitute it a broad lode within the rule announced in the Eureka and Lawson Cases, that on and above that level large ore bodies have been found here and there, but irregularly, and mined out, to the extent of many million dollars in value. But it contends that below the ninth level and on down to the ore bodies in question, a distance of more than a quarter of a mile, the bed has not been broken, crushed, altered, fissured and mineralized, that it is black unaltered limestone with its bedding planes undisturbed; and the District Judge found that the intervening mass of limestone was comparatively unbroken, unchanged and unmineralized and that the ore bodies above were separated from those below by the inclosing porphyry sheet and fingers and by the barren, unmineralized and comparatively unbroken and unaltered limestone, and reached the conclusion that the broad lode apexing within the mining claims of appellant does not include within it this intervening barren limestone or the Leadville ore body. It is a fact that the intervening mass of limestone has not been thoroughly explored; but two drifts, one on appellant's 1,300-

and the other on its 1,600-foot level have been run entirely through it to the Leadville ore bodies, and it also extended a crosscut from its 900-foot level down into the Leadville territory. There is also a crosscut northerly from the 700-foot level through the limestone and into the quartzite above. There were numerous drifts and crosscuts from the workings above extending northerly for short distances into the intervening limestone. The same condition of the bed was found in all of them, unaltered and unmineralized, except in rare instances where there was some evidence of fissuring, also, but rarely, some indications of mineralization. This was more pronounced at a point on the 1,600-foot drift, about 450 feet from the Leadville ore bodies, where some mining was done by appellant and some ore extracted.

[5] The appellant first discovered the ore bodies in question when its 1,300-foot drift reached the Leadville fissure, after it had been driven more than a quarter of a mile. There is much significance in the fact that the four drifts which were driven entirely through the limestone below the workings above were not availed of to prospect the bed thoroughly. A comparatively small amount of this kind of work was done. It is difficult to avoid believing that the reason lay in the fact that there was no expectation of finding ore in such a formation. It was black limestone, its bedding planes only slightly and infrequently disturbed, unchanged in color, clearly showing that it had not been subjected to the processes of mineralization. This was the very opposite to its condition in the workings above and along the fault below. When the drift was run which disclosed the ore at the fissure it was known that the Leadville or Dana fissure existed in the quartzite above the bed in that locality, and the most probable reason for its extension through this long stretch of unbroken, uncrushed and unmineralized limestone was the expectation of finding ore in the bed when the fissure should be reached. Furthermore, the many short drifts northerly from the workings above, apparently abandoned when they were well into the unaltered black limestone, are mute witnesses that appellant was without hope or expectation of finding ore by going farther into this unchanged sedimentary rock. The evidence does not permit us to take a contrary view to that of the District Judge as to the condition of the limestone bed above the ore deposits in question, nor to his conclusion that the great ore deposits in the mine above were almost wholly south of the porphyry dyke. It is true that there was mineralization at a few places along the northerly side of the dyke and some ore was found there and mined, but there is serious doubt as to whether or not sheets of porphyry that had split off from the main dyke were not to the north of these deposits. It is a fact of great significance that the north boundary of the ore deposits taken out above followed substantially the dip of the dyke downward on its southerly side, and dyke and ore deposits continued in that relation to lower depths to the east. We are impressed, as was the trial court, with the weight of the contention that the hanging wall of appellant's broad lode was along the dyke downward from its contact with the quartzite over the bed, and that in consequence neither the limestone northerly from the dyke, nor the ore below under appellee's claims

were in or a part of appellant's broad lode. But whether the dyke or the barren limestone immediately north of it be taken as the hanging wall seems to us immaterial, one of them, perhaps both, interchangeable at places, must be said to mark the limit to mineralized rock in that direction. For, as said in Beals v. Cone, supra:

"Many definitions of veins have been given, varying according to the facts under consideration. The term is not susceptible of an arbitrary definition applicable to every case. It must be controlled in a measure, at least, by the conditions of locality and deposit. Cheesman v. Shreve, 40 Fed. Rep. 787. The distinguishing feature between a vein and the formation inclosing it may be visible; it must have boundaries, but it is not necessary that they be seen; their existence may be determined by assay and analysis. Cheesman v. Shreve, 40 Fed. Rep. 787; Hyman v. Wheeler, 29 Fed. Rep. 347; Iron Silver M. Co. v. Cheesman, 116 U. S. 529. The controlling characteristic of a vein is a continuous body of mineral bearing rock in place, in the general mass of the surrounding formation. If it possess these requisites, and carries mineral in appreciable quantities, it is a mineral bearing vein, within the meaning of the law, even though its boundaries may not have been ascertained."

[6-8] Disclaiming a purpose to weaken the opinion in the Lawson Case as a precedent on which it relies, appellant contends that the record in the Lawson Case introduced in this case, and the testimony of its witnesses, show that the two mines, the one in that case and the one in this, are only 3,300 feet apart on the same sedimentary bed, lying in both places between quartzite, that the bed in both places was subjected to the same dynamic force in being uplifted or tilted, that in both places it was broken or penetrated by masses of porphyry, that the minerals in it are copper and lead at both places, that the bed was fissured, faulted, broken and altered in both, and that inasmuch as it was found to be a continuous lode down to the Ashland fissure in that case, the finding of the district court in this case is contradictory to the finding of the court in the Lawson Case on substantially the same facts, and is wrong. It is therefore contended that facts in the original record in the Lawson Case but not embodied in the brief recitation of facts in the opinion in that case (134 Fed. 769, 67 C. C. A. 587) should be compared by us to the facts in this case, together with the testimony of appellant's witnesses on the same subject, and if found to be analogous to the facts in this case we should, upon the authority of the Lawson Case, reverse the District Court. Every opinion must be read in connection with all that is said in it, and the controlling principles of law which it announces are applied to the facts found within its four corners. In no other way is it an authority than on facts analogous to those found in it. As said in Carroll v. Lessee of Carroll, 16 How. 275, 287 [14 L. Ed. 936]: "Its weight of reason must depend on what it contains." Moriarty v. City of New York, 132 App. Div. 10, 116 N. Y. Supp. 323; Yoders v. Township, 172 Pa. St. 447, 33 Atl. 1019, 51 Am. St. Rep. 750. We must accept the facts recited in the opinion in the Lawson Case,—they were accepted by the Supreme Court, 207 U. S. 1, 28 Sup. Ct. 15, 52 L. Ed. 65, as the premise from which the conclusion there reached was drawn. This is not at all challenged; but it is said by counsel that the record "is offered for the purpose of proving what facts were involved, and not for the purpose of establishing the truth of those facts." We are disposed to think

that the principle that a party litigant is not bound, nor his rights affected, by facts adduced in a prior controversy over a different subject-matter, to which he was not a party and in which he was not and could not be heard, renders the position untenable. 2 Chamberlayne, Modern Law of Evidence, § 1652 et seq. The same contention was made here, and answered and denied by us in Utah Con. M. Co. v. Utah Apex M. Co., 277 Fed. 41, 46, for reasons there given. Moreover, if the competency of the original record in the Lawson Case be admitted, there are, nevertheless, controlling facts in this case which distinguish it from that case, requiring a different conclusion. In that case there was not a bed of unbroken black limestone more than a quarter mile in extent between the ore body in question and ore bodies above it, as in this case, nor were ore bodies above such a mass of limestone terminated or cut off in their descent, as in this case, nor was there in that case a porphyry dyke through the limestone bed approximately between the ore bodies above and an unmineralized limestone bed below it, as in this case, nor did the ore bodies in that case trend to the east and pitch downward coincident with the trend and pitch of the porphyry dyke and the unbroken, unmineralized limestone below it, as in this case.

Affirmed.