(March 1, 1890.)

## GILPIN v. SIERRA NEVADA CONSOLIDATED MINING COMPANY.

[23 Pac. 547, 1014.]

MINE OWNERS' RIGHTS—EQUITY—POWER OF COURT—INJUNCTION—
    NONJOINDER OF PARTIES.—Nonjoinder of parties plaintiff is not
    properly in issue on an application for an injunction against the
    acts of a stranger to the property threatened with injury.

WHEN PARTY ENTITLED TO INJUNCTION.—Where a party makes a
    *prima facie* case that he is in possession of a claim, and his sur-
    face location shows a vein the apex of which is within the lines
    of the claim, and carries valuable ore, he is entitled to an in-
    junction restraining other parties owning contiguous claims from
    extracting ore from a vein within his lines until the matter can
    be determined on its merits.

CLAIM OWNER'S RIGHTS—IRREPARABLE INJURY—WASTE.—Where a party alleges that acts are being committed and threatened to be continued in violation of his rights, which will cause waste, great or irreparable injury, he is entitled to a writ restraining the commission of such acts, particularly where the subject matter of the litigation is a mine, and the act complained of is the removal of the ore therefrom, by underground workings, which would render the mine worthless.

BOUNDARY LINES OF MINING CLAIM.—Section 2322 of the Revised Statutes of the United States provides, among other things, that the owner of a mining claim "shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lode or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations."

APPEAL from District Court, Shoshone County.

No briefs found on file.

The complaint shows the plaintiff to be the owner, and entitled to the possession, of one compact piece of mining lands in the Yreka mining district, Shoshone county, Idaho territory, embraced within the outer boundary lines of three contiguous mining claims, called the "Apex," the "Rambler," and the "Tip Top," all constituting the plaintiff's said mining grounds; that while the plaintiff was so in possession, on the 29th of October, 1888, the defendant, a corporation, entered upon such grounds of the plaintiff, and with force, etc., took possession, and unlawfully ejected the plaintiff, and still unlawfully withholds the same from the plaintiff, to his damage of $100,000; that the plaintiff's said claim is upon a mineral zone or belt containing gold, silver, and other precious metals; that previous to such ouster the plaintiff had been working and mining the three locations named as above, as one mining claim, continuously since the third day of November, 1887; that the defendant owns a mining claim adjoining on the east of these several claims of the plaintiff, so constituting one claim, the defendant's claim, being called the "Sierra Nevada"; that the western side line of the Sierra Nevada is coincident with eastern end boundary line

of said Tip Top claim, and also with the eastern end line of the Apex claim, and nearly coincident with the eastern end line of the Rambler claim. The relation of the properties of the parties is shown by the following diagram:

The plaintiff further claims, in substance, that the plaintiff's middle claim, the Apex, is upon and along said mineral zone or belt; that the mineral-bearing rock in place is a part of such zone, and crops to the surface in and upon the Apex location, the true apex of the zone or belt being within the exterior boundaries of the Apex claim; also, that the zone or belt is of greater width than the Apex claim, and extends on either side of the Apex, and is covered by the Rambler and Tip Top locations. The plaintiff also claims, and the fact is admitted by the defendant both in its cross-complaint and in argument, that the defendant, prior to the commencement of this action, has been working the Sierra Nevada claim, and from the underground tunnels in the Sierra Nevada claim has extended its works and tunnels, beyond its western side line, into and upon the grounds claimed by the plaintiff, and maintains his possession thereof against the plaintiff, and has been and is extracting and carry-

ing away ore therefrom, and is, as the plaintiff avers, preventing the plaintiff from working his mines within his own mining grounds; that such acts are waste, and irreparable damage to the plaintiff's property; to recover which property, with other purposes, this action is instituted; that the defendant is a foreign corporation, and insolvent; and prays that pending the litigation a temporary injunction be granted, etc. The allegations of the complaint are made positively, as of the plaintiff's own knowledge, and the same are verified in the same manner.

The answer is upon information and belief, and is so verified. It admits that the defendant is a foreign corporation. Except this admission, it denies every other material allegation of the complaint, and prays that the complaint be dismissed. The defendant also files his cross-bill, and prays affirmative relief; and for such purposes makes this plaintiff, Larry O'Neill, A. D. Bevin, David Le Ban, A. M. Baldwin, Edward Leonard, W. T. Malony, William Rogers, C. J. McMillen, B. F. Bates, and W. B. Heyburn, parties defendant, and avers: 1. The corporate character of the cross-ocmplainant. 2. That on the 6th of April, 1886, the lands of the Sierra Nevada claim were public domain, and unoccupied mineral lands, and on that day were duly claimed, by parties named, as a mining claim, under that name; that said locators, with others who had become interested in the Sierra Nevada claim, on June 3, 1886, "having discovered the true strike and course of said vein," filed an amended location of said claim, as it now appears on the diagram heretofore given; that the cross-complainant became the owner of such amended location and claim on the 15th of November, 1886, and is still such owner, and in possession of the same, and has expended $100,000 in improvements thereon, in tunnels run in and upon said vein, cross-cuts, shafts, etc., and is still in possession of all such tunnels, etc. 3. "That while said E. M. Gilpin claims to be the owner in his own right of said Apex mining claim, as a matter of fact, each and all of the parties hereto, to wit [the other defendants in this cross-complaint named] are the owners of undivided interests therein as tenants in common with the said E. M. Gilpin," and the claim of said Gilpin to be the sole owner is untrue; wherefore said parties are joined as defendants herein in order that "their claims, together with the

claim of the said E. M. Gilpin, may be fully and finally determined, adjudicated, and settled"; that said defendants "actually claim an interest unknown to the cross-complainant in and to the premises hereinbefore described, and in and to the vein thereon, which is the Sierra Nevada lode mining claim and vein"; and, that such claim may also be settled, it is necessary that all of said defendants be made parties. 4. That all of the defendants are insolvent, and are pretended owners of a mining claim described in the complaint of the plaintiff, Gilpin, as the Apex, Rambler, and Tip Top mining claims, and, as such alleged owners, have by their underground workings entered upon the Sierra Nevada claim, and by shafts, etc., have gone down and broken into the works of the cross-complainant, "made by its following its said vein, upon the dip thereof, into the ground," and threaten to take and hold possession, etc., of said workings so broken into, and are engaged in underground works with that intent. 5. That the locations of the Apex, Rambler, and Tip Top are in fact void and of no effect, because they were made, or attempted to be made, within the line of the Sierra Nevada, etc., and that, if the defendants be allowed to carry out their designs, the cross-complainant will sustain irreparable damages. 6. And prays that the defendants named, except said Gilpin, be brought in as defendants; that all such defendants be decreed to have no right to any of the ground in controversy; that pending this suit the defendants be enjoined from entering upon, etc., any of the grounds in dispute, and upon the determination of the action the injunction be made perpetual.

A large amount of evidence was taken upon the issues so made up, and upon the fifth day of February, 1890, his honor, Judge Sweet, by order, denied the injunction. From that order an appeal is taken by the plaintiff to this court.

W. B. Heyburn and W. W. Woods, for Appellant.

William H. Clagett and Albert Hagan, for Respondent.

BERRY, J. (After Stating the Facts).—There are three principal points in this case: 1. Is the plaintiff the owner of the mining grounds claimed by him, so as to be entitled to invoke the aid of this court to prevent the acts complained of? 2. Is

the injury alleged of such a character as to warrant the exercise of the equity power of the court? And 3. Is such injury, in fact, threatened or being done?

As to the question of nonjoinder of parties plaintiff, that is not properly in issue on an application for an injunction against the acts of a stranger to the property threatened with injury. A party may intervene to protect by injunction his own interests, as well as the interests of his cotenants. But, if this were otherwise, the deeds to plaintiff introduced in evidence on the hearing cover all the interests of each of those persons in each of the three claims alleged by the plaintiff to belong to him, except said W. B. Heyburn, who is not shown to have any interest in either of said claims; and from the evidence there appears to be no ground for such claim.

We may first inquire, then, as to whether the plaintiff has shown sufficient to give him a standing in court. This case seems to have been tried, in part at least, upon the theory and tacit understanding that *prima facie* proof of the plaintiff's title was all, on the question of location, that need be shown in such a case as this. After some evidence had been put in by the plaintiff tending to show the validity of his location of the Apex claim the court asked: "Are you gentlemen going into matters showing everything which goes to show a valid location? Plaintiff's Counsel: We do not want to. Defendant's Counsel: We do not either. Plaintiff's Counsel: We just propose to make a *prima facie* case"—and passed immediately from the subject of the Apex location (which to that point had been the subject of the evidence) to the location of the Rambler. This may not be considered as a stipulation releasing the plaintiff from the obligation to introduce further evidence on the location of the Apex, or that the evidence already in made a *prima facie* case of location; but it seems to express the mutual understanding between the court and the counsel on either side as to the theory and rule of law on which the case was to be heard and determined; and may well have had an effect in restricting the amount of evidence which either side might deem necessary after making a *prima facie* case. It is not to be presumed that the defendant, on a preliminary motion, and especially under such circumstances, would introduce all the evidence he would on the trial.

From a review of the plaintiff's evidence up to the close of the examination of John Gill this theory was evidently relied on; but afterward, however, the plaintiff returned to the subject of the location of the Apex, introduced Michael Gibbons, John M. Burke, W. Clayton Miller, J. M. Porter, C. D. Porter, and other witnesses as to the facts of locations, as to the character of the ledge claimed in the Apex, its outcrop within the Apex lines, the character of the material as to ore, its appearance or non-appearance in the shaft sunk from the surface of the Apex, the dip of the underground veins, and the relation of the ledge claimed for the Apex with the defendant's drifts beyond the west side line of the Sierra Nevada, and on other points.  Much of this evidence was controverted by the witnesses of the defendant, and some of it was corroborated; but, on the whole, the weight of the testimony seems to be in favor of the validity of the plaintiff's locations.  He certainly makes a strong *prima facie* case, covering his surface locations, and, of course, to the vein in the Apex, whatever it may be, and wherever it may run or dip.  The defendant, in its brief, says: "The plaintiff should establish his title to the surface ground under which he claims, which, to say the least, is very doubtful upon the showing." This is the defendant's view after the evidence is all in.  It must be noted that the plaintiff is in possession of his claim, and the presumption is that his possession is lawful, and the burden is on the defendant to repel such presumption, and also that one object of this action is to settle the question of that right.  In the cross-bill the defendant demands that it shall be settled.  The action of the judge, or of either of the judges, before whom this motion has been considered, did not affect, or tend to affect, that settlement.  The judges had no authority to do that.  The fact of the plaintiff's compliance with the law, or his noncompliance, is a question of fact only, to be determined on the trial of the case.  If, then, after all this preliminary proof on both sides is in, the question is pronounced by the defendant as "doubtful upon the showing," the *status* of the plaintiff as a proper party to demand the preservation of the property he is contending for is practically conceded.  But without such concession the law insures such right to the plaintiff.

We may then inquire as to the character of the injury alleged. By section 4288 of the Revised Statutes of Idaho, subdivisions 1-3, it is provided that an injunction may be granted "(1) when it appears by the complaint that the plaintiff is entitled to the relief demanded, and such relief, or any part thereof, consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually"; and "(2) when it appears by the complaint or affidavit that the commission or continuance of some act during the litigation would produce waste, great or irreparable injury to the plaintiff; (3) when it appears during litigation that the defendant is doing . . . . some act, in violation of the plaintiff's rights, respecting the subject of the action, and [having a] tendency to render the judgment ineffectual." The statute seems to be framed to meet the case of such an injury as is here complained of. The subject matter of the litigation is a mine, which is valuable only for the mineral it contains. To remove that mineral is certainly waste, and waste is one ground for the issuance of this writ. It is also great injury; and that is another ground, whether it be reparable or not. Irreparable injury is still another ground, disjoined in the statute from the other grounds. To remove the ore from the mine, and leave but a worthless shell to be contended for, would certainly have a "tendency to render ineffectual" any judgment which the plaintiff might recover. Conceding the plaintiff's rights to his mining claim and to the ledge to be as stated in the complaint, it cannot be argued that continuing to remove the ore from the mine is not waste of the property, nor that such acts do not constitute great damage, nor that to do so does not tend to render a judgment in his favor ineffectual. The chief argument of the defendant is that the defendant is solvent, and abundantly able to pay any damage which may be found against it. But even on this point the case is against the defendant. The complaint states that the defendant is a foreign corporation. That is admitted. Also, positively, that it is insolvent. That is only denied on information and belief. There was no evidence given on the subject at the hearing. Hence, that allegation of a fact in the case, except for the purposes of pleading only, must be taken as unanswered.

On the whole, upon this point, it may well be questioned whether the plaintiff has not fully shown that the injury, if consummated, will be irreparable. But, whether it be fully shown or not, the other statutory grounds, as we have seen, are sufficient to authorize him to claim an injunction.

We may then turn to the main and last consideration in this case, and inquire whether the evidence taken shows that the injury complained of is in fact being done. We have before said that, *prima facie,* a miner is confined within the boundary lines of his claim. Section 2322 of the Revised Statutes of the United States, provides, among other things, that the owner of a mining claim "shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations." The claim of the defendant is that the veins of ore on which the defendant admits it is working are veins, the top or apex of which lies inside of the side lines of the Sierra Nevada claim. On the other hand, the plaintiff avers that the apex of such veins is not within the side lines of the Sierra Nevada claim, and hence that the defendant has no right to follow it within the plaintiff's lines. His theory is that the true apex of the lode is in his Apex claim, and that its strike is nearly at right angles with the western side line of the Sierra Nevada claim, and that the dip of the vein matter is more to the south than is claimed by the defendant. But the plaintiff also urges that, wherever the apex of this vein may be, or if it have no apex at all, but is simply a blanket vein, if its apex be not between the defendant's side lines, the defendant has no right to follow it into the plaintiff's grounds, or within the boundaries of the claims of which the plaintiff is in possession. That is a proper construction of the law. The defendant's right to that ore, if he have such right, must be based solely upon the fact that the vein has its apex within its own side line. The difficulty in determining this matter is greatly increased by the

fact that no up-raises upon the vein are shown to have been made by the defendant to determine its apex, or to show its dip or trend.   No shafts have been sunk on any of the ground in question, except it be the shaft in the Apex claim, which penetrated the workings of the defendant.   Considerable evidence has been produced, mostly (unless we except the evidence of the Apex shaft, and diagrams and plats of defendant's workings) of a speculative character.   There is in that evidence much conflict on material points.   But, considering all of the witnesses of equal credibility, the circumstances under which their knowledge was obtained, and the probabilities of their correct understanding of the facts, throws light upon many of these apparent discrepancies; and the actual measurements and plats of skillful engineers show controlling facts, in view of which the oral evidence must be understood, and erroneous theories must be corrected.   The courses of the surface lines of these several claims require careful attention.   The fact that the Sierra Nevada claim has been relocated and swung around from its original location has little or no bearing upon what is here the main question.   We are to consider the claim as it now is.

It is proved without a question that the plaintiff sunk a shaft from about midway between the side lines of the Apex claim, and near the eastern end line, in what is described as "ledge matter," consisting of quartzite, talc, and some ore, at a considerable deflection to the south from a vertical line, following the dip of this so-called "ledge matter" in its several variations, but always inclining to the south, a distance of about one hundred and fifty feet, and was led thereby upon and into the underground workings of the defendant; that such shaft, in its descent, when the defendant's work was struck, had passed beyond the side line of the Apex claim, a considerable distance into the Rambler grounds; that in the descent the plaintiff found some ore before reaching the defendant's works, and had put some in sacks before reaching the lagging over the defendant's tunnel. This so-called "ledge matter" is testified to as continuous.   It is worthy of note that the ore which the defendant was tunneling and stoping out was, in character, carbonate and galena.

"Witness Gibbons.—Q.    State from your observation as to the quality of the ore.    A.    It was carbonate, I said."    This does not seem to be controverted, and the fact may bear upon the question of apex or dip; for it is a matter of common knowledge that carbonate ores are sometimes found in blanket veins without apices or dips.    The extraordinary width of this mineral belt or zone—extending, as all concede, often to many hundreds of feet—is unusual, and hardly conceivable in a fissure vein; also its position, almost horizontal, at least in the claims in question. All, taken together, may raise strong doubts, in the absence of actual demonstration, of its being in its main breadth a fissure vein at all.    If that were so, it would be an end to the controversy between the parties, and the injunction should, of course, issue.    But the case is presented as concerning a fissure vein only, with the usual apices and dips; and so we must consider it, by the light given us by the evidence.    In examining the maps and diagrams in the case, our attention is at once called to the fact, from the map of the defendant (exhibit "X"), that the mean dip of the vein in the grounds claimed by the plaintiff, corresponding, also, mainly to the evidence of the witness, is south, five degrees west.    The north side line of the Apex claim runs south, eighty-two degrees, thirty minutes east.    Hence, such dip is only two and one-half degrees east of a right angle with that side line of the Apex claim, or nearly at right angles with it.    The lead of the vein as claimed by the defendant on that map seems by inspection to be about north, from five to ten degrees east; so that the average dip, as the defendant claims it, would deflect from the lead of the Sierra Nevada ledge something less than five degrees—possibly not at all.    It was stated on the argument, and not controverted, and as we think the rule is, that the true average dip of a vein is always at right angles to the lead; and, if the veins so being worked by the defendant are really dips from the Sierra Nevada claim or lead, it is difficult to harmonize these principles and facts.    But they do all harmonize with the claim and theory of the plaintiff.    To comply with the defendant's theory, the average true dip should be west, and perhaps some degrees north of west, or at least ninety degrees from what it is shown to be on the map, and also as stated by the witnesses.

The following diagram, drawn from the exhibits, mostly of the defendant, will tend still further to illustrate the facts in the case:

Tunnel A is a working tunnel, and some distance below the plane of the mineral and of the tunnels upon the ore. All the tunnels, B, C, D, E, are claimed by the defendant to enter on the outcrop of the ledge; but the elevations marked on exhibit "X" show that such outcrop is not an apex or crest of a vein dipping laterally from it, but that it is an outcrop on the mountain side of a mineral deposit, nearly horizontal in position, but rising slightly as it recedes into the hill, and at right angles with a line formed by the mouths of these tunnels. All these tunnels run on the footwall, or rather on the bedrock or floor of the ore deposits. Here there can be no dispute as to the respective elevations of the mineral at the points named. The elevation of the bottom of the mouth of tunnel B is three thousand four hundred and fifteen feet. At its face, in the Rambler claim, it is three thousand four hundred and nineteen feet—a rise of four feet. The elevation at the mouth of tunnel C, distant from B about one hundred and fifty feet, is three thousand four hundred and thirty-eight feet. At a point a little over

two hundred feet west, where the measurement was taken, its elevation is three thousand four hundred and forty-one feet—a rise of three feet. Tunnel D, at its mouth, is three thousand four hundred and forty-nine feet. At about one hundred and fifty feet west, its elevation is three thousand four hundred and fifty-four feet—a rise of five feet. At a point near the southeast corner of the Apex claim, it falls to three thousand four hundred and forty-eight feet—a depression of one foot below its mouth, about two hundred and fifty feet distant. The elevation of tunnel E at its mouth is three thousand four hundred and sixty-nine feet. In about one hundred feet it descends to three thousand four hundred and sixty-seven feet, and in about sixty feet further rises to three thousand four hundred and seventy-two feet, or to a plane three feet above its mouth. It is admitted on the argument that the water from these workings of the defendant flows out at the mouths of these tunnels. When we consider that these tunnels are practically almost parallel with each other, and running nearly west, it seems impossible to conclude that these deposits of ores in any way dip from anything yet shown in the Nevada claim. They all rise upward from the entire Sierra Nevada system, whatever its formation may be.

But, further considering the tunnel developments, there is not one of them that does not leave the line of the Sierra Nevada outcrop, practically, at right angles to it—each, as testified by the defendant's witnesses, upon a vein of mineral, and pursuing an almost due westerly course; tunnel B, at least, running over six hundred feet—and all ending among the stopes, uniting these tunnels at their westerly ends. Not one tunnel indicates a lead in the direction of what the defendant claims as the apex of its mining claim; but all of them do indicate an extension of the mineral belt or zone westerly, at almost right angles from the defendant's outcrops, longitudinally with the side lines of plaintiff's claims, through and westerly of the point reached by the plaintiff's shaft, from what is called the "discovery point" of the Apex claim, the bedrock or floor of the whole system rising slightly from the outcrop on the Sierra Nevada as the system, zone, or mineral belt and the defendant's tunnels reach to the

westward. Another fact, heretofore mentioned, has proof positive in the several elevations of these tunnels—namely, that the dip of the floor of this mineral belt or zone is from north to south. The elevation at the mouth of tunnel B is three thousand four hundred and fifteen feet. One hundred and fifty feet northerly, at the mouth of C, the rise is twenty-three feet. At D, one hundred and twenty-five feet farther, the rise is eleven feet. From D to C, one hundred feet farther north, it is twenty feet. So that the rise from B to C—a distance, by inspection, of the map, of about three hundred and seventy-five feet—crossing this mineral belt, is fifty-four feet; and as far west as these tunnels go along this belt the same relations in the elevations of the southern portions seem to be maintained. This also corroborates the evidence of some of the witnesses, and is consistent with plaintiff's claim.

From these and other like facts, it seems to us as plain that defendant shows no reason whatever to justify it in extending its works, and extracting the ore in this mineral ground west of its own side line of the Sierra Nevada claim, and within the boundary lines of the plaintiff's mining claim. The order denying the injunction should be overruled, and a temporary injunction should issue, as prayed in the complaint. It is so ordered.

BEATTY, C. J., Specially Concurring.—Upon the record we have in this matter, were it a hearing upon the merits, I would hesitate to agree to a reversal; for, from the examinations I have been able to make of the testimony, I think its weight seems to be with the defendant. This, however, is not to settle the title to the ground in controversy, but only to preserve its value until that title can be settled upon full hearing. Admitting the defendant is right, the inconvenience to it from an injunction will be less than would be the damage to plaintiff should he prove to be right. Always, in questions of injunction on the working of mines, the doubt should be resolved in favor of granting the writ. There is evidence for and against plaintiff's claim of a ledge in his Apex ground, and in the shaft therein; but the undisputed fact, which with me is almost controlling, is that the various workings of the Sierra Nevada show a nearly flat vein, with a much more decided dip to the south than to the

west, which so far sustains plaintiff's theory that the vein runs easterly and westerly, instead of mere northerly and southerly as defendant claims. At the same time it must be admitted that, from all the facts before us, the general course of the great principal vein through the country, for miles, is as defendant holds. Whether that dip to the south may be from some dislocation of the ledge, from neighboring dikes, or other causes— may be a part of another cross-ledge—I do not undertake to answer. The simple fact is, it is there; and, until clearly explained as only the result of some dislocation of the ledge, and not its true dip, I think plaintiff should be protected. I do not agree to any suggestion that these workings are a part of a wide vein, on the zone theory. While it may so prove, I do not think the facts before us so show; and I will not indulge in any theory. My concurrence in reversing the order refusing the plaintiff an injunction is based alone upon the reasons I have here stated.

SWEET, J., Dissenting.—The plaintiff is the owner of what is termed the "Apex mining property," situated in Yreka mining district, Shoshone county, Idaho. This property is composed of three claims, called the "Tip Top," "Apex," and "Rambler." The defendant, a corporation, is the owner of the Sierra Nevada mining claim. The properties of plaintiff and defendant join, the three first-named claims lying along the west side line of the Sierra Nevada. Plaintiff asks that a writ be issued, restraining the defendant from mining and extracting ore from within the grounds of the Rambler mining claim. Defendant admits that it is extracting ore from within the lines of the Rambler, but avers that it has a lawful right so to do, by reason of the alleged fact that in crossing the west side line of the Sierra Nevada, and entering the ground of the Rambler, it is following a vein upon its dip, the apex of which is within the boundary lines of the Sierra Nevada. Plaintiff admits that, if defendant is following a vein upon its dip, the apex of which lies within the defendant's lines, it has a perfect right so to do, but avers that defendant is not following the vein upon its dip, but upon its strike. It is conceded by counsel that the vein in controversy is situated on or is a part of the great mineral ledge or vein beginning with the Sullivan, in Milo gulch, and extending to the Eureka, in Government gulch, a distance of about two

miles. Both sides appeal to the same authorities, the same cases, and, one may almost say, to the same facts. Maps have been filed and witnesses have been examined touching every phase of the controversy; but, after a careful consideration of the entire matter, partly from the evidence and partly from the maps, acknowledged by both parties to be correct, I find myself unable to assent to nearly all the conclusions presented in the opinion just rendered, and believe it to be my duty to dissent from the same at some length.

If the general strike or trend of the vein is in an easterly and westerly direction, it must necessarily cross the side lines of the Sierra Nevada on its strike; and, if it so crosses the Sierra Nevada on its strike, it must pass through the Apex property on its strike, and its true dip would, under the showing made, be to the south. If, on the other hand, the general strike or trend of the vein is north and south, and admitting that it crosses the Sierra Nevada in a northwesterly and southeasterly direction, then, as a matter of course and as a matter of fact, its true dip could not be either to the north or south. It must be either to the east or west, or to the southwest or northeast, depending upon the question as to whether there is a considerable variation in the vein from a direct course of north and south. It is not necessary for me to deal extensively with the authorities cited, for the reason that no serious legal propositions are in dispute. As before stated, it is almost entirely a question of fact; certain legal propositions being, perhaps, more or less involved.

I cannot assent to the conclusion that it is the duty of the defendant to show that plaintiff is not the owner of the surface ground embraced within the lines of the Rambler. I believe the correct determination of this phase of the question to be as follows: Plaintiff must show, by a preponderance of evidence, that he is entitled to the writ asked for by reason of his ownership of the ground, and must also prove his ownership of the ground by a preponderance of testimony. Having established his title to the Rambler (sufficiently, at least, for the purposes of this action), and thus becoming the legal owner, *prima facie,* of all ore found within its boundary lines, it would devolve upon defendant to show by a preponderance of testimony that it was

authorized to cross its own side line into the ground of the Rambler. I am, therefore, disposed to consider the right of the defendant to enter the ground of the Rambler solely from two standpoints: First, and principally, as to whether defendant is following the Sierra Nevada vein upon its dip; and, second, the validity of the Rambler location—the latter question being hereinafter discussed from the standpoint raised by counsel for plaintiff, upon what must be termed a theory of the case, but a theory that has been implicitly accepted and relied upon in the decision just rendered.

The court in this instance would not, of course, try the title to the surface ground of either of the properties involved. It would devolve upon the plaintiff, however, to show *prima facie,* a valid location; and this must depend, first, upon a valid discovery, otherwise plaintiff would simply appear on behalf of the United States to enjoin the defendant from mining in ground that did not belong to it, or from unlawfully following its vein beyond its side lines. Such a position is not assumed by plaintiff, but reliance is placed upon the *prima facie* discovery.

Plaintiff seems to rely upon two theories, as nearly, at least, as I am able to ascertain his exact claim. One is that his location is based upon the actual discovery of the Sierra Nevada vein, as the term "vein" is commonly understood, within the lines of the Apex; and that the Sierra Nevada location was made upon the same vein as it extended in an easterly and westerly direction through the ground covered by the Sierra Nevada location. It is also proposed to place this case within the rule laid down in *Eureka Con. Min. Co. v. Richmond Min. Co.,* 4 Saw. 302, Fed. Cas. No. 4548, reprinted in 9 Morr. Min. Rep. 578. At least, whether plaintiff relies upon the *Eureka v. Richmond* decision or not, the opinion presented is based upon that theory. This may be due to the fact that counsel for plaintiff, during his very forcible presentation of the case, always referred to the vein as a zone or belt. In the opinion rendered, it seems to be treated as a zone or belt. The conclusion must be reached, not from the evidence submitted in the case, but from the declarations of counsel. This theory is that what has heretofore been called a "vein," extending from the Sullivan location in Milo gulch to the Eureka location in Government gulch, is

a mineralized belt or zone, and that a location made on this belt
is a location within the law; and that, therefore, a location
within the boundary lines of the Apex was valid, whether any
ore body located in or extending through this belt came to the
surface at that point or not.   In *Eureka Con. Min. Co. v. Rich-
mond Min. Co.*, Justice Field, speaking for the court, defines
the meaning of the word "lode," as used in the act of Congress,
as follows: "But to the practical miner, the fissure and its walls
are only of importance as indicating the boundaries within which
he may look for and reasonably expect to find the ore he seeks.
A continuous body of mineralized rock, lying within any other
well-defined boundaries on the earth's surface and under it,
would equally constitute, in his eyes, a lode.   We are of opin-
ion, therefore, that the term, as used in the acts of Congress,
is applicable to any zone or belt of mineralized rock lying within
boundaries clearly separating it from the neighboring rock.   It
includes, to use the language cited by counsel, all deposits of
mineral matter found through a mineralized zone or belt com-
ing from the same source, impressed with the same forms, and
appearing to have been created by the same processes."

Having defined a "lode," within the meaning of the act of
Congress, to be, under some circumstances, a zone or belt of
mineral, Justice Field discusses the vein in controversy in the
Eureka-Richmond case, and says: "We find that it is contained
within clearly defined limits, and that it bears unmistakable
marks of originating, in all its parts, under the influence of the
same creative forces.   It is bounded on the south side for its
whole length, at least so far as explorations have been made, by a
wall of quartzite of several hundred feet in thickness, and on its
north side, for a like extent, by a belt of clay or shale ranging
in thickness from less than an inch to seventy or eighty feet.   At
the east end of the zone, in the Jackson mine, the quartzite and
shale approach so closely as to be separated by a bare seam less
than an inch in width.   From that point they diverge until, on
the surface in the Eureka mine, they are about five hundred feet
apart; and on the surface in the Richmond mine, about eight
hundred feet.   The quartzite had a general dip to the north
at an angle of about forty-five degrees; subject to some local
variation.   As the course changes, the clay or shale is more

perpendicular, having a dip at an angle of about eighty degrees. At some depth under the surface these two boundaries of the limestone, descending at their respective angles, may come together. In some of the levels worked, they are now only from two to three hundred feet apart."

Thus, in the Eureka case, we have a belt of mineralized limestone, lying between formations of quartzite and shale. The ore is found in pockets or bodies, regardless of any uniformity in course, except as to the general course of the entire belt. Justice Field also defines a "lead" to be a vein or seam or strata indicating mineral, and, followed by the miner, takes him to the body of ore he seeks. Of course, it is understood that this vein or seam or strata must be in place; and by being "in place" it means that the mineralized substance, whatever it may be, is presented in a separate and distinct form from that which lies upon either side of it; although, perhaps, it is not necessary for the discovery that both walls be perfectly defined, and the vein, as a fissure vein, be perfectly demonstrated.

Plaintiff does not pretend that he has a vein of pay ore from the surface in the Apex ground to the point where the workings of the Apex come in conflict with those of the Sierra Nevada. He claims a seam of mineralized talc, iron, and quartzite, considered by him as an indication of ore, and that, as a miner, he believed would lead him to ore. Starting on this seam at the surface, he followed it until he reached the workings of the Sierra Nevada, and he therefore claims that the finding of ore justified his theory in following the indications mentioned. To justify the location of material of this sort in the mind of a practical miner, and in the absence of knowledge on his part that he would find a body of ore by sinking the shaft, whether he had indications of mineral or not, it is doubtful if he would expend very much money in following such an indication, unless it lay between well-defined walls, and was, in fact, a fissure vein. Then he would spend a large or a small sum of money, depending upon how strong the indications were, and whether or not he might be an adventuresome or a very conservative miner. In this case the plaintiff was bound to discover the ore, because the defendant was already taking it from the ground beneath his shaft; and, as a matter of course, it was only a ques-

tion of the depth of the shaft until the ore body would be reached. I am of the opinion that this position is not consistent with the other claim made by plaintiff—that the Sierra Nevada is a well and clearly defined ledge, extending in an easterly and westerly direction, crossing the Sierra Nevada, and entering the ground of the Rambler upon the strike of the vein, instead of upon its dip. It is hardly possible that the two conditions can exist. If this entire quartzite belt is similar to the belt or zone described by Justice Field in *Eureka Con. Min. Co. v. Richmond Min. Co.,* then the Sierra Nevada can be but a pocket or chute of ore in that belt. Messrs. Burke, Clement, and Porter agree that, in examining the underground workings of the Sierra Nevada, whatever its course or dip may be, they found a perfect vein, with perfect walls, and in the judgment of each it was a complete and genuine fissure.

Again, the quartzite belt is not sufficiently defined by any of the witnesses to authorize a court in sending the question to a jury on that issue. There must be something more to this belt to make it a mineralized zone, within Justice Field's decision, than iron-stained quartzite. By the witnesses referred to, the Sierra Nevada vein is described as a very strong and powerful one. That it should stain the adjoining rock for a greater or less distance along its entire course is not at all remarkable, and would, perhaps, be expected. In defining the character of this fissure, the witnesses describe it as being incased within walls of quartzite, with a gangue between the ore body and the walls. The only thing to indicate that it is a part of a belt is that both walls are of quartzite, and this only demonstrates that it is not a contact vein.

To return to the theory that it is a belt or zone of mineral, composed of many veins and deposits, it must be borne in mind that no witness has defined it. In the Eureka case, the mineral belt, which was held to be a zone, was confined within well-defined walls of quartzite and shale; and the only thing remarkable about the vein in that case was its extraordinary width and narrowness at different places. There is no evidence whatever as to the well-defined limits, or as to the lead in question being incased between walls of any character. Proceeding on this theory, the plaintiff followed a seam composed of talc, iron, and

mineralized quartzite from the surface in the Apex to the point where he came in conflict with the workings of the Sierra Nevada, within the Rambler lines. Plaintiff had the lead, but where did it lead him? It led him to a body of ore. To what body of ore? To the Sierra Nevada, which had been followed from the surface, where the outcropping was plain and undisputed, to the point where plaintiff's workings came in contact with the ore. The defendant, to be sure, had crossed the side line of its claim; and this brings us to the second phase of the case. In crossing the side line, was it following the vein upon its dip, or upon its strike? And thus the two questions of fact in this very important case are before us.

In passing from the belt or zone theory of the plaintiff (if it may be said that the plaintiff has any such theory), which is, that a location anywhere on the belt, outside the lines of any other valid claim, is good, I can state that, if plaintiff had established a case sufficient to bring the issue at bar within the rule laid down in *Eureka Con. Min. Co. v. Richmond Min. Co.*, this investigation would assume more difficult proportions. Within the zone or belt theory, a location was made upon the Apex and Rambler. The examination of the witnesses shows that the discovery amounted to iron, manganese, and iron-stained quartzite. So far as any evidence has been introduced on the subject, such is the general character of the entire mountain. Again, I say, whether this mountain is in itself a vein, lying between distinct formations and containing different veins and pockets, as in the Eureka-Richmond case, there is not sufficient evidence to show; and, unless it does come within that rule, it is clear that no valid discovery was made on these claims lying to the west of the Nevada, unless the course of the vein is east and west, and not northwest and southeast. Under the theory adopted in the opinion just submitted, the location of the Apex is valid, because, if I correctly understand it, it is higher on the surface of the mountain than the location in the Sierra Nevada. Carrying out this theory, if the entire mountain is a vein, the one who finally locates on the very summit has the apex of the vein. Three or four locations of this character, if such reasoning be correct, will secure all the ore in the Coeur d'Alene.

Defendant contends that the Sierra Nevada vein, as located, constitutes a vein, within the meaning of the law; not as contemplated in the Eureka-Richmond case, but that it is a true and complete fissure, and in no sense a part or portion of such a belt as is defined in said case. Each and every witness testified that this vein was perfect in every particular. Its perfection and completeness were emphasized by witnesses supposed to be interested with, or in sympathy with, both plaintiff and defendant; and, as already stated, on all of the evidence presented, I am forced to the same conclusion, and think no court justified in accepting the zone or belt theory for any purpose whatever. What the future may develop I am not here to decide. Plaintiff and defendant agree that the Nevada vein, whether it be a mineralized zone or belt, or a distinct fissure vein, as commonly understood, is a part of the great vein of mineral extending from the Sullivan to the Eureka, a distance of about two miles. Both parties admit that the true dip of a vein is at right angles to its true strike; and, as a matter of course, the converse must be true. If, therefore, the dip can be obtained, there is no difficulty in settling the true strike or course of the vein; and, on the other hand, if we can obtain the true course of the vein, it would settle the true dip. The parties to this action agree up to this point.

Plaintiff, however, maintains that the true dip can and should be ascertained from the workings within the Sierra Nevada. The defendant relies upon what the workings in the mine demonstrate, as well as upon the well-known course of the vein. I am of the opinion that the true dip of this vein may be more correctly ascertained by examining the map showing the general course of the vein along its entire known length, in connection with the workings, than by attempting to settle it from the dip in the comparatively few feet exposed in the workings of the Sierra Nevada.

It is claimed by plaintiff that the general course is easterly and westerly; and by the defendant, that it is northwest and southeast. Plaintiff urges, in vindication of his theory, that, while the vein dips to the southwest, it dips to the south more than to the southwest, and that this fact is demonstrated by the

entire workings in the Nevada. Defendant admits that, at the place indicated, the dip is more to the south than to the southwest; but claims that, inasmuch as the course of the vein is in a northwesterly and southeasterly direction, the dip to the south is but a wave in the vein, for the reason that it is impossible for a vein running northwesterly and southeasterly to dip to the south, because the dip, as both admit, must be at right angles to the true course. Mr. Clement testified that the course of the vein through the Nevada was north and south, by forty degrees west. Mr. Gibbons testified that the vein crosses the west side line of the Sierra Nevada at right angles. If this be true, the position taken by plaintiff is correct. Without going into a consideration of the evidence upon this point, I must conclude, from the croppings, as they appear, without dispute, along the surface of the Sierra Nevada claim; from the fact that on the line drawn from the Sullivan to the Eureka the general course or trend of this vein would be northwest and southeast; from the fact that it dips to the southwest with as much uniformity as to the south— that it cannot cross the west line of the Sierra Nevada at right angles, and that its true dip would not be to the south, notwithstanding it may thus appear from the tunnels now run upon the footwall within the Nevada claim.

Conceding that the true course of this vein is northwest and southeast, the true dip, at right angles with that course, would be southwest; which would certainly be parallel with the Nevada end lines, making said end lines practically at right angles with the true course of the vein, and the side lines substantially parallel therewith. This conclusion as to the dip and strike of the vein is based upon taking into consideration the entire course of the vein between the points indicated, the statements of witnesses, and the admissions of counsel. I do not believe the true dip of this vein can be ascertained from the underground workings in any one mine on its course, at the depth as yet attained by any of these properties. No doubt the entire vein runs in waves, as it crosses gulches and climbs mountains, until it straightens up under the mountains, or passes beyond the effect of surface disturbances.

My conclusions are: 1. If the vein in question does not come within the rule laid down in the Eureka-Richmond case, the Rambler location is void. There is no proof whatever that the mineralized belt, or portion of the mountain upon which the Rambler is located is incased within walls; or, in other words, that it constitutes a lead, lode, or vein, within the meaning of the rule laid down in the Eureka-Richmond case. Indeed, the showing as to the completeness of the Sierra Nevada vein is overwhelming; and upon that question, as the evidence now stands, it would be impossible to send the issue to a jury. 2. The true course of the vein being, in my judgment, northwest and southeast, it is impossible that its true dip could be a little east of south; and, as it is conceded that the vein crosses the south end line of the Nevada, it is impossible that it should cross the west side line at right angles. Under the showing made, the true strike must be practically at right angles with the end lines of the Nevada. I have dissented at considerable length, because I deem the conclusions reached so far from the merits involved in the issue at bar as to be dangerous to the property interests of the community, in- the absence of a demonstration of the theory set forth and adopted in the opinion just rendered.